**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Adrian Abramovich. | ) | File No.:  EB-TCD-15-00020488 |
| Marketing Strategy Leaders, Inc., and | ) | NAL/Acct. No.:  201732170006 |
| Marketing Leaders, Inc. | ) | FRN:  0026627141 |

## FORFEITURE ORDER

**Adopted:  May 10, 2018**                                   **Released:  May 10, 2018**

By the Commission:  Chairman Pai and Commissioners Carr and Rosenworcel  issuing separate statements; Commissioner Clyburn not participating; Commissioner O'Rielly approving in part, dissenting in part and issuing a statement.

## I.    INTRODUCTION

1.        We impose a penalty of $120,000,000 against Adrian Abramovich, personally and doing business as Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc. (collectively, Abramovich),[1] jointly and severally, for perpetrating one of the largest spoofed robocall campaigns that the Commission has ever investigated.  Abramovich made 96,758,223 illegal spoofed robocalls during a three-month period in 2016 in violation of the Truth in Caller ID Act of 2009 (Truth in Caller ID Act) and the Commission's rules (Rules).  The Truth in Caller ID Act and Rules prohibit any individual from falsifying caller ID information with the intent to defraud, cause harm, or wrongfully obtain anything of value.  This prohibited practice is better known as "spoofing."  Accurate caller ID information allows consumers to make informed decisions about which calls to accept, ignore, or block, and whether the party on the other end of the phone line is reputable and deserving of their trust.  As technology has advanced, the dangerous combination of spoofing and illegal robocalls has become much more pervasive, making illegal robocalling campaigns more deceptive, more disruptive, and harder to stop.

2.        The FCC released a Notice of Apparent Liability for Forfeiture (*NAL*) against Abramovich for apparently engaging in unlawful spoofing[2] and a Citation and Order (*Citation*) finding that he violated the Telephone Consumer Protection Act (TCPA) and Rules by making unauthorized and disruptive prerecorded telemarketing calls (i.e., robocalls) and violated the wire fraud statute.[3] Abramovich filed a combined response to the *NAL* and *Citation* (Response) denying an intent to defraud, cause harm, or wrongfully obtain anything of value, and requesting a "significant reduction" in the proposed forfeiture.[4]  The Response does not deny liability for any of the apparent violations identified in the *NAL* or specifically seek cancellation or dismissal of the *NAL* or the *Citation*.

---

[1] This Forfeiture Order refers to Adrian Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc., collectively as "Abramovich."  It refers to Adrian Abramovich in his personal capacity as Mr. Abramovich.

[2] *Adrian Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc*., Notice of Apparent Liability for Forfeiture, 32 FCC Rcd 5418 (2017) (*NAL*).

[3] *Adrian Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc.*, Citation and Order, DA 17-593 (June 22, 2017) (*Citation*).

[4] Adrian Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc., Response to Notice of Apparent Liability and Citation and Order (on file in EB-15-00020488) (July 27, 2017) (Response).  While in the ordinary course a response to the *Citation* would be addressed by the Bureau, because Abramovich filed a combined

(continued…)

3.      After reviewing Abramovich's Response, we find no reason to cancel or withdraw the *Citation*,[5] and find no reason to cancel or withdraw the *NAL*, or reduce the proposed penalty.  We therefore assess the $120,000,000 forfeiture the Commission previously proposed.

## II.     BACKGROUND

4.      In recent years, consumers have reported receiving spoofed robocalls offering vacation packages, including to Mexico and the Caribbean.  The calls appear as local numbers on caller ID systems, often tricking consumers into answering.[6]  When consumers answer the call, they hear a prerecorded message instructing them to "Press 1" to hear more about an "exclusive" vacation deal purportedly offered by a well-known travel or hospitality company such as TripAdvisor, Expedia, Marriott, or Hilton.  Consumers are then transferred to a call center, where live operators attempt to sell the consumer one or more vacation packages (usually involving timeshare presentations), but are not affiliated with the well-known brands presented to the consumer during the prerecorded message.  Some consumers report receiving these calls multiple times per week.[7]

5.      In December 2015, Spōk, Inc. (Spōk), contacted the Commission to report and complain about a significant robocalling event that was disrupting its emergency medical paging service.[8]  According to Spōk, because Spōk's paging technology is not equipped to handle voice calls, a large-scale robocalling campaign may disrupt—and can potentially disable—the network.  From the information provided by Spōk, the Commission traced the calls to Mr. Abramovich through his company, Marketing Strategy Leaders, Inc., a Florida based corporation.[9]

---

(Continued from previous page)

response, we address both the *Citation* and *NAL* in this Forfeiture Order.  The Response also included an attached affidavit sworn by Mr. Abramovich which will be referred to herein as "Affidavit of Adrian Abramovich."

[5] Although Abramovich did not request cancellation or withdrawal of the *Citation* in his Response, we nevertheless reach this holding to provide clarity and certainty in any future proceedings that may arise, as well as any future actions or conduct by Abramovich.  *See Citation* at paras. 2, 41 (notifying Abramovich that any future violations of the TCPA and wire fraud statute may result in civil penalties, including forfeitures).

[6] As part of the investigation, Enforcement Bureau staff spoke with consumers who confirmed receiving these calls and expressed extreme frustration and annoyance about these spoofed calls.  For example, one consumer said she uses her cellular phone for business and cannot afford to not pick up a local call because it might be a client or business lead.  These robocalls distract her from her work and waste her time.  *See NAL*, 32 FCC Rcd at 5420, para. 5 & n.12.

[7] *See NAL*, 32 FCC Rcd at 5420, para. 5.

[8] Spōk, headquartered in Springfield, Virginia, provides paging services for hospitals, emergency rooms, and physicians.  Paging services are essential in hospitals and emergency rooms across the country, with an estimated 85 percent of hospitals relying on this technology to ensure that emergency room doctors, nurses, EMTs, and other first responders receive immediate alerts.  *See* Priyanka Dayal McCluskey, *Hospitals turning a 'pager' on data hardware*, The Boston Globe (Feb. 2, 2016), https://www.bostonglobe.com/business/2016/02/01/beep-this-accessory-busy-doctors-finally-gets-upgrade/gRcjTy7w3RuTJiqaeKTsEN/story.html.

[9] *See* Affidavit of Adrian Abramovich at 1 (attesting to the following: "During October 1, 2016 through December 31, 2016, I was engaged in the business of generating leads for unrelated third-party clients.  These operations were conducted through two companies, Exclusive Leads Services, Inc. and Emerald Media, Inc. . . . [o]n or about December 23, 2015, I ceased conducting any business through my prior company, Marketing Strategy Leaders, Inc. and the company was voluntarily dissolved on January 29, 2016.").  The call detail records show that Abramovich continued to use the Marketing Strategy Leaders name in his robocalling operations through the end of 2016.  *See* Carrier Call Detail Records, January 11, 2017 (on File No. EB-TCD-15-00020488) (Call Detail Records).  Furthermore, Abramovich does not contest personal liability.

6.        In April 2016, TripAdvisor, Inc.,[10] contacted the Bureau to report that it had received several consumer complaints about robocalls that invoked TripAdvisor's name without TripAdvisor's knowledge or authorization.  In response to these complaints, TripAdvisor launched an independent investigation and determined that the robocalls directed consumers to various websites purporting to be travel companies.[11]  Furthermore, TripAdvisor's investigation found that these travel companies contracted with Abramovich's Marketing Strategy Leaders to place the robocalls.[12]

7.        On December 13, 2016, Bureau staff subpoenaed Marketing Strategy Leaders' carrier to obtain call records.  The carrier responded on January 11, 2017, providing call records covering the three-month period from October 1, 2016 to December 31, 2016.[13]  According to subpoena responses received by the Commission, Mr. Abramovich, purporting to do business as Marketing Strategy Leaders, made 96,758,223 calls during this time period,[14] averaging over a million calls a day.[15]  Furthermore, Bureau staff sampled 1,000 calls from the call records for almost each day of the three-month period that Abramovich made calls (for a total sample of 80,000 calls) and found that every reviewed call was spoofed.[16]  Each calling number was spoofed, appearing to be originating from a number that matched the area code (first three digits) and central office code (second three digits) of the called number.[17]

8.        On June 22, 2017, the Commission issued the *NAL* proposing a $120,000,000 forfeiture against Abramovich for apparent willful and repeated violations of Section 227(e) of the Communications Act of 1934, as amended (Act),[18] Section 64.1604 of the Rules.[19]  In a separate action, the Bureau cited Abramovich for making illegal robocalls in violation of Section 227 of the Act and Section 64.1200 of the Rules and for making fraudulent representations over the telephone system in violation of the federal wire fraud statute codified in Section 1343 of Title 18.[20]  The *Citation* directed Abramovich to take immediate steps to comply with the law.

---

[10] TripAdvisor, Inc. (TripAdvisor), is a publicly traded U.S. advice and information company that offers user-generated reviews of travel accommodations, restaurants and tourism attractions.  *See* TripAdvisor, About TripAdvisor, https://tripadvisor mediaroom.com/us-about-us (last visited Dec. 21, 2017).  TripAdvisor provides a portal for third-party travel provider partners to promote their services, but does not itself sell any travel tickets or vacation packages.  *Id.*  ("TripAdvisor [] is not a booking agent or tour operator, and does not charge any service fees to users of our site.").

[11] Some of the websites included sunpricevacations.com, pricelesstimes.com, and holidaysandsinternational.com.  *NAL*, 32 FCC Rcd at 5420-21, para. 7 & n.18.

[12] *Id.* (identifying websites and citing Declaration of ███████████).

[13] *See Id.* at 5421-22, para. 9.

[14] *Id.* at 5421-22, para. 9.  Total calls for each month are as follows:  36,539,979 (October), 30,724,165 (November), and 29,502,000 (December).  *Id.* at 5421, para. 9 n.24.

[15] *Id.* at 5421-22, para. 9.  On his busiest day, October 19, 2016, Abramovich made 2,121,106 calls.  The fewest calls he made on a single business day was 644,051 and averaged over 200,000 calls on Saturdays.  *Id.* at 5421, para. 9 & n.25.

[16] *Id.* at 5421-22, para. 9.  While there are 92 days total in the three-month period, Abramovich only made calls on 80 of those days.

[17] *Id.*

[18] 47 U.S.C. § 227(e).

[19] 47 CFR § 64.1604.  *See Rules and Regulations Implementing the Truth in Caller ID Act of 2009*, Report and Order, 26 FCC Rcd 9114 (2011) (*Truth in Caller ID Act Report and Order*).

[20] The *NAL* includes a more complete discussion of the facts and history of this case and is incorporated herein by reference.

9.      On July 27, 2017, Abramovich filed a combined response to both the *NAL* and *Citation*. In the Response, Abramovich denies having "any intent on his part to defraud, cause harm or wrongfully obtain anything of value."[21]  The Response further states that he "neither admits nor denies the factual allegations of conducting telemarketing activities through the use of prerecorded calls and transmitting inaccurate caller ID information."[22]  Abramovich, however, admits that he "was engaged in the business of lead generation for unrelated third-party clients" but that "[a]s of June 22, 2017, [he] ceased any and all telemarketing or lead generation activities."[23]  With respect to the *NAL* specifically, Abramovich provides no support for his categorical denial of an intent to defraud, cause harm, or wrongfully obtain anything of value in violation of the Truth in Caller ID Act.  Rather, the Response argues that the Commission did not "properly apply the factors" in Section 503(b) for assessing the forfeiture in this case and that the forfeiture imposed "is otherwise unconstitutional."[24]  Abramovich does not specifically seek cancellation or dismissal of the *NAL* or the *Citation*.  Instead, the Response claims that Abramovich is unable to pay the proposed forfeiture and thus asks for a "significant reduction" in the proposed forfeiture.[25]

## III.   DISCUSSION

10.      The Commission issued a *Citation* for violating the TCPA.  The Response does not challenge the *Citation*.  Abramovich does not dispute that he made, or was responsible for making, millions of autodialed calls without the called party's consent, nor does he assert that his actions were permitted as a result of any of the exceptions to the TCPA prohibition.  In addition, Abramovich does not dispute that he violated the federal wire fraud statute.  Thus, we affirm the *Citation* and find that Abramovich willfully and repeatedly violated Section 227 of the Act, Section 64.1200 of the Rules, and violated the federal wire fraud statute codified in Section 1343 of Title 18 for the reasons set for therein.

11.      With respect to the *NAL*, the Commission proposed a forfeiture against Abramovich in accordance with Section 503(b) of the Act,[26] Section 1.80 of the Rules,[27] and the Commission's *Forfeiture Policy Statement*.[28]  In determining the proposed forfeiture, the Commission applied the Section 503(b)(2)(E) balancing factors, taking into account the "nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."[29]  As discussed below, we have fully considered Abramovich's response to the *NAL* and find it unpersuasive.  We therefore affirm the $120,000,000 forfeiture proposed in the *NAL*.

---

[21] Response at 1.

[22] *Id.*

[23] *Id.* at 2.  *See* Affidavit of Adrian Abramovich.

[24] Response at 2, 6.

[25] *Id.* at 8.  Abramovich submitted personal and corporate Federal tax returns for the years 2014, 2015, and 2016 to support his claim of inability to pay.  *See* Affidavit of Adrian Abramovich, Exhibit A.

[26] 47 U.S.C. § 503(b).

[27] 47 CFR § 1.80.

[28] *The Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, Report and Order, 12 FCC Rcd 17087 (1997) (*Forfeiture Policy Statement*), *recons. denied*, Memorandum Opinion and Order, 15 FCC Rcd 303 (1999).

[29] 47 U.S.C. § 503(b)(2)(E).  *See also Truth in Caller ID Act Report and Order*, 26 FCC Rcd at 9132, para. 46 (although the Commission is not statutorily required to apply the Section 503(b)(2)(E) balancing factors in cases involving apparent violations of Section 227(e), the Commission said it would do so).

**A.** **Abramovich Engaged in a Massive Spoofing Scheme with the Intent to Defraud, Cause Harm, or Wrongfully Obtain Anything of Value**

12.    The Truth in Caller ID Act outlaws "caus[ing] any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value."[30]  Congress observed that consumers greatly value accurate, reliable caller ID information to help them decide whether to answer a phone call and, ultimately, whether to trust the caller on the other end of the line.  Congress noted that consumers' widespread expectation is that any information appearing on caller ID represents the true originating number of the person or entity making the call.[31]  Congress also recognized that there are some benign uses of caller ID spoofing technology, e.g., in protecting domestic abuse victims, and therefore intended to focus efforts "to curtail ID spoofing . . . on actions by persons with intent to deceive or cause harm."[32]

13.    In the Response, Abramovich does not admit nor deny the factual allegations.  He does not dispute or offer evidence to refute (i) that the Caller ID information was spoofed; (ii) that the spoofed calls were made by Abramovich or at his direction; (iii) that the messages indicated, falsely, that the caller represented a well-known travel or hospitality company; or (iv) any other critical fact that formed the basis for the Commission's proposed forfeiture.[33]  Abramovich asserts, however, that he had no "intent . . . to defraud, cause harm or wrongfully obtain anything of value."[34]  Abramovich did not support that assertion with any evidence or affidavit.

14.    Thus, the only contested fact is whether Abramovich intended to defraud, cause harm or wrongfully obtain anything of value when he made the spoofed calls.  As courts have recognized, direct evidence of specific wrongful intent is rarely available.[35]  Therefore, it is reasonable, and indeed often necessary, to look at a party's actions to determine whether there was an intent to defraud or cause harm.[36]  In the particular circumstances presented in this case, specific intent can be inferred by, among other things, Abramovich's reckless disregard of the fact that his actions would inexorably defraud and

---

[30] 47 U.S.C. § 227(e)(1).

[31] *See* 156 Cong. Rec. H2522, H2524 (2010) ("Now, if you see a caller ID and you see it has a phone number, most people think that it's ironclad that that's the actual phone number that's calling them when in truth it's not.").

[32] S. Rep. No. 111-96, at 2 (2010), *as reprinted in* 2010 U.S.C.C.A.N. 1376, 1377 (2009).

[33] In a Senate Commerce committee hearing, Abramovich denied that the recordings included the names of Marriott or other travel companies.  *See Abusive Robocalls and How We Can Stop Them Before the S. Comm. on Commerce, Science, and Transportation*, 115th Congress (2018).  However, Abramovich has provided no evidence to support that assertion, and it is contradicted by consumer complaints.

[34] Response at 1.

[35] *See, e.g.*, *U.S. v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007); *U.S. v. Mirabelles*, 724 F.2d 1374, 1379 (9th Cir. 1984); *see also General Cigar Co., Inc. v. CR Carriers, Inc.*, 948 F.Supp. 1030, 1036 (D. AL 1996) ("Because one cannot know another's subjective intent, circumstantial evidence must be relied upon to indicate intent.  The requirement of specific intent under the mail fraud statute is satisfied by the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension and this intention is shown by examining the scheme itself." (internal citations omitted)).

[36] *See, e.g.*, *United States. v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007); *Tusa v. Omaha Auto Auction Inc.*, 712 F.2d 1248, 1253 (8th Cir. 1983) ("intent to defraud is ordinarily proved by circumstantial evidence"); *see also United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003) ("It is settled law that intent to defraud may be established by circumstantial evidence"); *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) ("the scheme itself may be probative circumstantial evidence of an intent to defraud"); *General Analytics Corp. v. CNA Ins. Co.*, 86 F.3d 51, 54 (4th Cir.1996) ("[B]ecause it is abstract and private, intent is revealed only by its connection with words and conduct."); *FDIC v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1035 (6th Cir. 1991) ("intent . . . is thought to refer to a subjective phenomenon that takes place inside people's heads.  [The law is concerned only with] the external behavior ordinarily thought to manifest internal mental states. . . .") (citations omitted)).

cause considerable harms to consumers, the affected travel companies, and carriers alike. The undisputed facts in this case support the Commission's determination that Abramovich intended to defraud or cause harm to: (1) consumers; (2) TripAdvisor, Expedia, Marriott, and Hilton (the companies named in the robocall messages to consumers); (3) carriers who carried the unlawful robocall traffic; and (4) consumers whose numbers were spoofed.

15.    First, with respect to consumers, Abramovich made more than 96 million spoofed robocalls. Abramovich's decision to spoof the caller ID information was intentional.[37] The fact that he chose not only to spoof the caller ID information, but to use the area code and three-digit prefix of the called party reflects an intent to deceive the called party. Abramovich intentionally made fraudulent representations with respect to the caller ID to induce consumers to answer the phone. And when consumers did answer the phone, they were told, falsely, that the caller was affiliated with Marriott, TripAdvisor, or other well-known brands. The volume of calls also supports our conclusion that Abramovich's behavior was intentionally harassing. Barraging consumers with unsolicited marketing calls demonstrates an intent to harm.

16.    Second, Mr. Abramovich intentionally attempted to trade on the reputations of companies such as TripAdvisor, Expedia, Marriott, and Hilton and then provided products from unknown timeshare providers in Mexico and elsewhere. Predictably, the name-brand companies suffered harm to their brands and company goodwill as unsuspecting consumers directed their outrage about spoofed calls—often posting on online forums—at the name-brand companies rather than Abramovich.

17.    Third, with respect to carriers, Abramovich (1) used the telephone system with the false or fraudulent pretenses discussed above to defraud consumers, (2) burdened the carriers' networks with illegal calls, and (3) caused consumer recipients to complain, adding to the workload of customer service agents, decreasing the perceived value of the service, and increasing carrier costs.

18.    Fourth, the Commission also received complaints from consumers stating that they experienced harm when their phone numbers were spoofed—harm in the form of angry phone calls from aggrieved robocall victims. This result was easily foreseeable, and suggests that Abramovich intended to harm consumers whose numbers he used to make spoofed calls to neighboring lines.

19.    Finally, the Response does not refute evidence and findings of fraud and harm. Based on these facts, we find Abramovich's actions were so likely to defraud and cause harm and, in fact, did defraud and cause harm, that we can conclude that he had the requisite intent to defraud, cause harm or obtain anything of value in violation of the Caller ID Act. Abramovich offers no alternative explanation for spoofing.[38]

20.    Accordingly, we reject Abramovich's unsupported assertion that he lacked intent to defraud or cause harm, and find that Abramovich knowingly displayed inaccurate or misleading caller ID with respect to 96,758,223 telemarketing robocalls with the intent to cause harm, defraud, or wrongfully obtain something of value. Further, we affirm the factual findings in both the *NAL* and *Citation* that were the basis for our conclusion that Abramovich willfully and repeatedly violated Section 227 of the Act,[39] Sections 64.1604 and 64.1200 of the Rules,[40] and violated the federal wire fraud statute codified in

---

[37] To "spoof" a telephone number requires an overt act to change the number that otherwise will appear by default on the called party's caller ID. *See generally* 47 C.F.R. § 1601. Neighbor spoofing in particular requires not only an overt act to change the number that will appear in the called parties caller ID but a conscious decision with respect to selecting the first six digits of the caller ID number to match the called party's first six digits.

[38] In the affidavit accompanying the Response, Mr. Abramovich does not assert that he lacked an intent to defraud, cause harm, or wrongfully obtain anything of value; in fact, the affidavit does not even attest that the statements contained in the Response are true and accurate.

[39] 47 U.S.C. § 227(e).

[40] 47 CFR §§ 64.1604, 64.1200.

Section 1343 of Title 18 by making fraudulent representations over the telephone system.  While we affirm our findings and conclusions of law in both the *NAL* and *Citation*, the forfeiture is based solely on violations of Section 227(e) of the Act[41] and Section 64.1604 of the Rules[42] identified in the *NAL*.

### B.       The Forfeiture Amount is Constitutional

21.      In a section captioned "Unconstitutionality of Proposed Forfeiture Amount," the Response raises several arguments regarding the amount of the forfeiture.  The Response argues that the forfeiture violates Abramovich's "due process protections afforded by the U.S. constitution because it is grossly disproportional to the gravity of the alleged actions taken by Mr. Abramovich."[43]  The Response also raises two other arguments without citing specific provisions of the Constitution.  First, the Response takes issue with how we calculated the forfeiture, claiming that the forfeiture is "disproportionate to the offense and unreasonable when comparing past FTC civil penalties for similar activities."[44]  Second, the Response claims that Abramovich had no "knowledge or warning" regarding the potential forfeiture amount prior to the *NAL*.[45]  After considering the Response's arguments, for the reasons discussed below, we find that the forfeiture imposed for each violation committed by Abramovich is consistent with the Constitution and statutory framework established by Congress.

22.      Section 227(e) of the Act, as amended by the Truth in Caller ID Act, authorizes the Commission to assess a civil forfeiture against persons who knowingly cause, directly or indirectly, any caller ID service to transmit or display misleading or inaccurate caller ID information with the intent to defraud, cause harm, or wrongfully obtain anything of value.[46]  The statute also limits the maximum amount of forfeitures for each violation to $11,052.[47]

### 1.       The Forfeiture Does Not Violate Abramovich's Due Process Rights

23.      The Response cites *St. Louis, I.M. & S. Ry. Co. v. Williams* (*St. Louis*) for the proposition that due process limits the power of states when prescribing damages for aggrieved persons where the penalty is wholly disproportionate to the offense and obviously unreasonable.[48]  In that century-old decision, a company operating a railroad charged more than the prescribed fare.  Passengers sued and the company was ordered to pay a penalty.  The Supreme Court affirmed the penalty.  We find the case inapposite to the case now facing the Commission.  Our case involves the power of a federal agency, not a state, to impose a forfeiture consistent with clear standards articulated by federal law.  In any event, the

---

[41] 47 U.S.C. § 227(e).

[42] 47 CFR § 64.1604.

[43] Response at 6.

[44] *Id*. at 6-7.

[45] *Id*. at 7.

[46] 47 U.S.C. § 227(e)(5)(A)(i); 47 CFR § 64.1604(a).

[47] *Id*.  The per violation maximum was initially set at $10,000, and has subsequently been raised periodically to account for inflation.  *See* 47 U.S.C. § 227(e)(5)(a)(i) ("The amount of the forfeiture penalty determined under this paragraph shall not exceed $10,000 for each violation"); 47 CFR § 1.80 (adopting the statutory maximum with the required inflation adjustment); *Adjustment of Civil Monetary Penalties to Reflect Inflation*, Order, DA 16-1453 (Dec. 30, 2016).  In the alternative and in lieu of the Act's general criminal penalty provisions in Section 501 of the Act, the Truth in Caller ID Act also provides for criminal fines up to $10,000 for each violation, or three times that amount for each day of a continuing violation.  47 U.S.C. § 227(e)(5)(B).  *See Adjustment of Civil Monetary Penalties to Reflect Inflation*, Order, DA 16-1453 (Dec. 30, 2016).

[48] *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919); Response at 6.  The case involved an Arkansas statute that regulated rates related to railroad companies and prescribed penalties for violations.  *St. Louis*, 251 U.S. at 63-64.  A penalty was imposed and St. Louis, I.M. & S. RY. Co. appealed arguing the penalty violated the "due process clause of the Fourteenth Amendment . . . ."  *Id.* at 64.

Court in *St. Louis* upheld the penalty, recognizing that agencies have "wide latitude of discretion" when assessing fines.[49]  Although—in the Court's view—the penalty in *St. Louis* seemed large when compared to the harm, $75 for a $0.66 overcharge, the Court nevertheless found that the fine did not violate due process.[50]  Further, the Court recognized that the amount of a penalty must be evaluated in context, including  "the interests of the public, [and] the numberless opportunities for committing the offense . . ."[51]  We therefore disagree that the decision in *St Louis* supports Abramovich's challenge to the forfeiture amount.

24.     Moreover, the Supreme Court has since made clear that, where procedural due process protections such as fair notice are not implicated (which, discussed below, they are not in this case), "the guaranty of due process" in the Fifth and Fourteenth Amendments "demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained."[52]  As discussed below, the forfeiture amount is not arbitrary or capricious and has a real and substantial relation to the objective of the regulatory scheme.  Among other things, many millions of consumers and companies were exposed to harm as a result of Abramovich's unlawful spoofing.

### 2.     The Forfeiture is Not Excessive and Does Not Violate Other Provisions of the Constitution

25.     We understand the Response to be claiming that the proposed forfeiture constitutes an excessive punishment in violation of the Eighth Amendment, although the Response does not articulate that claim explicitly.[53]  We therefore evaluate the pertinent case law to address that claim.  In evaluating a claim that a forfeiture is excessive, we consider several factors.  A forfeiture that falls within the maximum prescribed by the applicable statute will receive a strong presumption of constitutionality, and at least one court has found it to be dispositive.[54]  Here, the forfeiture falls far below the statutory limits.

---

[49] *Id*. at 66-67.

[50] *Id*. at 66-67 ("Nor does giving the penalty to the aggrieved passenger require that it be confined or proportioned to his loss or damages; for, as it is imposed as a punishment for the violation of a public law, the Legislature may adjust its amount to the public wrong rather than the private injury.").

[51] *Id*. at 67.

[52] *Nebbia v. New York*, 291 U.S. 502, 525 (1934).

[53] U.S. Const. amend. VIII.

[54] *See United States v. Sperrazza*, 804 F.3d 1113, 1127 (11th Cir. 2015) (noting that a forfeiture within the permissible statutory range is "almost certainly" not excessive); *United States v. Chaplin's, Inc.*, 646 F.3d 846, 852 (11th Cir. 2011) ("Congress, as a representative body, can distill the monetary value society places on harmful conduct; forfeitures falling below the maximum statutory fines for a given offense therefore receive a strong presumption of constitutionality.") (citation omitted); *United States v. Malewicka*, 664 F.3d 1099, 1106 (7th Cir. 2011) ("There is a strong presumption of constitutionality where the value of a forfeiture falls within the fine range prescribed by Congress. . . .  These pronouncements reflect the considered legislative judgment as to what is excessive, and a court should be hesitant to substitute its opinion for that of the people."); *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002) (upholding the Commission's imposition of the maximum statutory penalty against an unlicensed radio operator who challenged that penalty as excessive noting that the statutory amount was "neither indefinite nor unlimited," and that it did not "seem excessive in view of [the petitioner's] continued and willful violation of the licensing requirement"); *see also United States v. Bajakajian*, 524 U.S. 321, 336 (1998) (deriving a constitutional excessiveness standard under the Eighth Amendment should recognize that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature."); *Gore v. United States*, 357 U.S. 386, 393 (1958) ("Whatever views may be entertained regarding severity of punishment, . . . these are peculiarly questions of legislative policy."); The Fifth Circuit holds that it is dispositive if the fine falls below the statutory limit.  *Newell Recycling Co. v. EPA*, 231 F.3d 204, 210 (5th Cir. 2000) ("No matter how excessive (in lay terms) an administrative fine may appear, if the fine does not exceed the limits prescribed by the statute authorizing it, the fine does not violate the Eighth Amendment.").

**Federal Communications Commission**                    **FCC 18-58**

The Commission specifically examined 80,000 of the 96 million calls and, after confirming that those calls were unlawfully spoofed, proposed a base forfeiture amount of $1,000 for each of the 80,000 violations, for a total of $80 million.[55]  We established the per violation base amount at the lowest base forfeiture amount specified in Section 1.80.[56]  We also took into account the statutory factors and upwardly adjusted the forfeiture based on the egregiousness of the violations (the massive volume of calls), the culpability of Abramovich, and prior noncompliance with the Communications Act.[57]  The Commission proposed an upward adjustment of $40 million to reflect the egregiousness of the harm associated with the illegal spoofed calls.[58]  The forfeiture thus equates to $1,500 per violation of the 80,000 calls analyzed (i.e., less than 15 percent of the statutory maximum amount of $11,052 per violation).  And the forfeiture is assessed only for a small subset of the total number of violations for which Abramovich was responsible.  The fact that even a greatly reduced per-violation forfeiture amounts to $120 million is a problem wholly of Abramovich's own making.  Abramovich elected to engage in massive spoofing and committed more than 96 million separate violations.  The volume of his violations does not justify a "volume discount."

26.        We also consider whether the forfeiture is "grossly disproportional" to the gravity of the offense.[59]  We find that it is not.  The burden to establish that a forfeiture is grossly disproportional lies with the party challenging the forfeiture.[60]  Factors bearing on whether a forfeiture is grossly disproportional include the nature and extent of the underlying offense, including whether it was in furtherance of other illegal conduct and the nature of the harm caused by the sanctioned person's conduct.[61]

27.        Abramovich fails to satisfy his burden.  Abramovich claims that being falsely induced to answer the phone did not cause substantial harm.  He argues that consumers were harmed only if they answered the phone and spent at least five minutes on the call.[62]  As a preliminary matter, the Truth in Caller ID Act does not require that there be actual harm; only that there be an intent to cause harm.  Thus, the "harm" occurred when Abramovich made the 96,758,223 illegal spoofed robocalls; irrespective of whether the consumer answered the phone or stayed on the line for five minutes.  Nonetheless, in this case, consumer complaints belie that "five-minute" argument.[63]  Moreover, the argument also does not address the harm that Abramovich's spoofing caused travel companies, carriers, and consumers whose numbers were spoofed.[64]    In that regard, the travel companies suffered harm in terms of their brand images and company goodwill as consumers expressed anger and frustration at the companies.  And carriers were harmed by (1) Abramovich using the telephone system with the false or fraudulent pretenses discussed above to defraud consumers, (2) burdening their networks with illegal calls, (3) preventing detection and ability to block the spoofed calls, and (4) expending resources handling consumer

---

[55] *NAL*, 32 FCC Rcd at 5426, para. 25.

[56] *See id.* at 5426, para. 25 & n.56; 47 U.S.C. § 227(e)(5); *see also NAL*, 32 FCC Rcd at 5426, para. 25 & n.55 (citing enforcement cases where the rules did not provide guidance drawing upon analogues base forfeitures).

[57] *See NAL*, 32 FCC Rcd at 5427, para. 26.

[58] *Id.*

[59] *See Chaplin's, Inc.*, 646 F.3d at 851 (*citing Bajakajian*, 524 U.S.at 334).

[60] *E.g.*, *United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1223 (2017).

[61] *See, e.g.*, *Viloski*, 814 F.3d at 109; *Collins v. SEC*, 736 F.3d 521, 526-27 (D.C. Cir. 2013).

[62] *See* Response at 4.

[63] *See infra* paras. 32-34.  Abramovich's proposed "five-minute rule" also ignores that the initial, spoofed call was a recording that urged the consumer to call another number; it seems unlikely that the consumer would remain on the line with a recording for more than five minutes.

[64] *See supra* para. 14; *see also NAL* paras. 19-20.

complaints directed at them rather than Abramovich.  As noted below, consumers whose numbers were spoofed also were harmed by the calls.[65]  Additionally, Abramovich does not deny that he committed more than 96 million violations of the Truth in Caller ID Act, nor does he suggest that the 80,000 calls on which we based the *NAL* were unrepresentative of his operation.  The scope of Abramovich's actions was enormous, and he makes no assertion to the contrary.  Further, each of the spoofed calls was done in conjunction with other activities that Abramovich does not disagree were unlawful—unauthorized robocalling and wire fraud.  And when people answered the calls, after being tricked into doing so by the false caller ID information, Abramovich and his clients lied about their identities, falsely claiming to represent companies with which they had no affiliation.

28.      In addition, the forfeiture is not arbitrary or capricious and is thus presumptively constitutional.  As the D.C. Circuit has explained, when an agency's decision to impose a penalty is not arbitrary and capricious, that "goes most of the way to compelling rejection of [any Eighth Amendment challenge to that penalty]."[66]  The court further noted that "[a] penalty that is not far out of line with similar penalties imposed on others and that generally meets the statutory objectives seems highly unlikely to qualify as excessive in constitutional terms."[67]  While the total amount of the forfeiture against Abramovich may seem large, it was derived using a methodology that the Commission has used many times before.  In establishing the forfeiture, we used the lowest per violation base forfeiture specified in the Rule.[68]  We then considered the statutory factors in Section 503 and determined that the amount should be augmented to reflect the egregiousness of the unlawful behavior.[69]  Moreover, instead of assessing the forfeiture on basis of all 96 million spoofed calls, we limited the forfeiture to the fraction of violations that we specifically examined (i.e., the proposed forfeiture was based on 80,000 of the potential 96,758,223 violations).  Thus, the forfeiture uses the methodology that the Commission has used in many cases and is not arbitrary or capricious.[70]  Abramovich's claim that the amount of the forfeiture is not in line with other forfeitures that the Commission has issued is simply wrong.  The argument ignores the fact that we only assessed $1,000 per violation and upwardly adjusted the forfeiture amount based on the Section 503 statutory factors which equates to an overall per violation amount of $1,500 (well in line with other Commission cases).  Further, the fact that Abramovich's actions resulted in massive violations was of his own doing and does not make the Commission's application of a settled and reasoned methodology arbitrary or capricious.

---

[65] *See* para. 33.

[66] *Collins* at 527.

[67] *Id.*

[68] *See NAL*, 32 FCC Rcd at 5426, para. 25 & n.56; 47 U.S.C. § 227(e)(5); *see also NAL*, 32 FCC Rcd at 5426, para. 25 & n.55 (citing enforcement cases where the rules did not provide guidance drawing upon analogues base forfeitures).

[69] *See* 47 U.S.C. § 503(b)(2)(E); *NAL*, 32 FCC Rcd at 5427, para. 26.

[70] *See, e.g.*, *Dynasty Mortgage, LLC*, Forfeiture Order, 22 FCC Rcd 9453, 9469-470, para. 43 (2007); *Dynasty Mortgage, LLC*, Notice of Apparent Liability for Forfeiture, 20 FCC Rcd 4921, 4933-34, para. 32 (2005) (establishing a base forfeiture of $10,000 for National Do-Not-Call violations, applying that base to 68 violations, and then upwardly adjusting to the maximum forfeiture penalty to address multiple, repeated and egregiousness); *Travel Club Marketing, Inc.*, Forfeiture Order, 30 FCC Rcd 8861, 8861-862, paras. 1-3 (2015); *Travel Club Marketing, Inc.*, Notice of Apparent Liability for Forfeiture, 26 FCC Rcd 15831, 15835-36, para. 12 (2011), (applying the $4,500 base forfeiture per violation and upwardly adjusting to the maximum forfeiture penalty for prerecorded voice advertising violations); *Tri-Star Mktg., Inc.*, Forfeiture Order, 15 FCC Rcd 23198 (2000) (applying $4,500 base forfeiture for each unsolicited fax advertisement violation and $10,000 base forfeiture for sending such an advertisement after a do-not-fax request); *Scott Malcolm*, Forfeiture Order, 31 FCC Rcd 1652 (2016); *Scott Malcolm*, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 2476, 2481-82, paras. 11-12 (2014), (applying the maximum forfeiture penalty for junk fax violations).

29.     Abramovich also points to cases that the Federal Trade Commission (FTC) has settled involving violations of the Telemarketing Sales Rule (TSR),[71] and notes that those cases ultimately imposed forfeitures lower than those proposed in the *NAL*.[72]  The FTC cases are inapposite for several reasons:  they represent settlements rather than a forfeiture order or court judgment; the cases involve a different agency and a different statute; and the monetary forfeiture was just one of many settlement terms, which included an injunction against future robocalling, relinquishment of other assets, recordkeeping and reporting requirements, and commitments of future cooperation with the FTC and state attorneys general.[73]  We reject Abramovich's suggestion these settlements requires the Commission to reduce the forfeiture proposed in the *NAL*.

30.     In light of the facts, and based on the balancing of factors outlined below, we conclude that the forfeiture is well within the limits established by the Eighth Amendment.

### 3.     There is No Constitutional "Notice" Problem

31.     Abramovich's constitutional rights were not violated with respect to notice (what the Response characterizes as a lack of "knowledge or warning" prior to issuance of the *NAL*).[74]  To the extent that Abramovich is suggesting that he should get a free pass under the Constitution because he is the first person whom the Commission has proposed to impose a forfeiture for perpetrating a massive unlawful spoofing campaign, that argument is without merit.

32.     The Act and the Commission's rules establish clear guidelines for the amounts of potential forfeitures for each individual violation, for potential upward and downward adjustment factors, and for the maximum total liability.[75]  Thus, Abramovich had "knowledge or warning" based on provisions in the law.  In addition, the Truth in Caller ID Act categorically states, "[i]t shall be unlawful for any person within the United States" to spoof calls with the intent to defraud, cause harm, or obtain anything of value.[76]  This provision has been the law of the land since 2010.  Further, the plain language of the Truth in Caller ID Act and the implementing Rules identify the elements of a spoofing violation, including the standard by which a case will be brought.  And the Truth in Caller ID Act and Rules specify the maximum potential forfeiture and are clear that the penalties apply on a per violation basis.  Thus, the Act and Rules make both the nature of the violation and potential forfeitures ascertainably certain to the public.[77]  Further, the Truth in Caller ID Act empowers the Commission "to proceed expeditiously to stop and . . . assess a forfeiture penalty against, any person or entity engaged in prohibited caller ID spoofing

---

[71] 16 CFR § 310 *et. seq.*

[72] *See* Response at 7-8 (the cases cited by Mr. Abramovich ended in settlements that ranged from $395,000 to $7,730,000 and included a number of conditions).

[73] *See, e.g.*, *FTC v. Caribbean Cruise Line, Inc.*, Stipulated Order for Permanent Injunction and Civil Penalty Judgment against Steve Hamilton, Case No 0:15-cv-60423 (S.D. Fla, Mar. 3, 2015), https://www.ftc.gov/system/files/documents/cases/150303caribbeanhamiltonstip.pdf.

[74] Response at 7.

[75] "[T]o provide guidance" to potential violators, the Report and Order adopting the Rules said that the Commission would "employ the balancing factors the Commission typically considers when determining the amount of a forfeiture penalty" to take into account the specific facts of a given case.  *Truth in Caller ID Act Report and Order*, 26 FCC Rcd at 9132, para. 46.  The Commission applied those balancing factors in this case.

[76] 47 U.S.C. § 227(e)(1).

[77] *See, e.g.*, *Star Wireless, LLC v. FCC*, 522 F.3d 469, 473 (D.C. Cir. 2008) (finding the regulation and other public statements of the FCC provided the "regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform" (citations omitted)).  The Truth in Caller ID Act is clear and concise, with no ambiguity as to what standards apply.  *See, e.g.*, *Botosan v. Paul McNally Realty*, 216 F.3d 827, 831 (9th Cir. 2000) ("Where the statutory language is clear and consistent with the statutory scheme at issue, the plain language of the statute is conclusive and the judicial inquiry is at an end.").

**Federal Communications Commission**                    **FCC 18-58**

without first issuing a citation" against the violator.[78]   Accordingly, we reject Abramovich's notice argument and find that the Truth in Caller ID Act and Rules provided the requisite prior notice and the process that Abramovich is due.[79]

**C.    A Reduction of the Proposed Forfeiture is Unwarranted**

33.    After considering the relevant statutory factors and the Commission's *Forfeiture Policy Statement*, we find that Abramovich is liable for a total forfeiture of $120,000,000.  As explained in the *NAL*, this total results from applying a base forfeiture of $1,000 to each of 80,000 calls the Commission confirmed were spoofed.[80]   We then took into account the statutory factors and proposed an upward adjustment of $40 million to reflect the egregiousness of the harm associated with the illegal spoofed calls.[81]   We also found Mr. Abramovich jointly and severally liable with his companies for the proposed forfeiture.  Mr. Abramovich does not contest joint and several liability.  He argues, however, that in December 2015, he ceased conducting business through Marketing Strategy Leaders, Inc., and dissolved the company in January 2016.  Notwithstanding Abramovich's claims, the call detail records show that Abramovich continued to use the Marketing Strategy Leaders name in his robocalling operations through the end of 2016.[82]   However, because Mr. Abramovich continued to operate under the name of a dissolved corporation, Marketing Strategy Leaders, during the time the violations occurred, he is not entitled to the protections of the corporate form and is personally liable for the full forfeiture amount.[83]   Also, Abramovich does not dispute that he is personally liable.

34.    Abramovich seeks a reduction of the proposed forfeiture.  The Response argues that the Commission failed to properly apply the statutory factors, including ability to pay, when proposing the forfeiture.[84]   In general, the Response argues the Commission (1) failed take into account Abramovich's ability to pay; (2) improperly calculated the forfeiture by not limiting it to consumers who, in Abramovich's view, were actually harmed; (3) should have apportioned the forfeiture to take into account that his clients and the telecom carrier who carried the calls played a role in the illegal robocalling and

---

[78] *Truth in Caller ID Report and Order*, 26 FCC Rcd at 9132, para. 47.  Under Section 503(b)(5) of the Act, a person who does not hold a license, permit, certificate, or other authorization issued by the Commission, or is not an applicant for the same, may not be issued a Notice of Apparent Liability for Forfeiture unless:  (1) that person is first sent a citation of the violation charged, (2) is given an opportunity for a personal interview with an official of the Commission, and (3) subsequently engages in conduct of the type described in such citation.  47 U.S.C. § 503(b)(5).  By contrast, the Truth in Caller ID Act only requires that the Commission provide the notice required under Section 503(b)(3) of the Act (notice and opportunity for a hearing before the Commission or an administrative law judge) or Section 503(b)(4) of the Act (Notice of Apparent Liability for Forfeiture) before assessing a forfeiture for unlawful spoofing.  47 U.S.C. § 227(e)(5)(A).  Here, we provide the required notice under Section 503(b)(4) of the Act through a Notice of Apparent Liability for Forfeiture.

[79] *See Steven Blumenstock*, Forfeiture Order, 32 FCC Rcd 356, 360, para. 14 & n.51 (EB 2017) (citing *Profit Enterprises*, Forfeiture Order, 8 FCC Rcd 2846, 2846, para. 5 (1993) and noting that violations of the Truth in Caller ID Act require no citation and that one "may not claim ignorance of the law as a defense").

[80] *NAL*, 32 FCC Rcd at 5426, para. 25.

[81] *Id*. at 5427, para. 26.  The Response asserts that, when calculating the forfeiture, the Commission assessed the upward adjustment of $40,000,000 on "the same volume of calls and same egregiousness" factor that formed the basis for the $80,000,000 base forfeiture (i.e., the 80,000 Reviewed Carrier Call Detail Records).  The Response is wrong.  We assessed a base forfeiture of $1,000 for each of the 80,000 spoofed calls verified by the Commission. We applied an upward adjustment of $40 million based on the egregiousness of the violations citing the full 96,758,223 spoofed calls coupled with Abramovich's culpability and prior history of non-compliance with the Communications Act.  *See NAL*, 32 FCC Rcd at 5427, para. 26.

[82] *See supra* note 9.

[83] *See NAL*, 32 FCC Rcd at 5427-28, para. 27.

[84] Response at 2.

12

spoofing scheme; and (4) improperly considered Abramovich's prior violations of the Communications Act (specifically, the TCPA) in considering prior non-compliance.[85]  Each of these arguments are discussed in more detail below.

> ### 1.   Abramovich Engaged in Egregious and Intentional Misconduct on a Massive Scale

35.     The Response argues that the Commission misapplied the "extent and gravity" factors because we should have ignored calls of "short duration" that did not "meaningfully" affect consumers.[86] The Response argues that a "more reasonable approach would be to determine the amount of consumers that were more likely to have been subjected to the marketing efforts of [Abramovich] and the travel companies."[87]  Abramovich asserts that the Commission should have included in its analysis only calls lasting more than five minutes.[88]  "This approach," according to the Response, "would have also been more representative of the actual harm caused by the acts allegedly committed by [Abramovich],"[89] and, more accurately reflect the "gravity" of the violations warranting a reduction in the forfeiture.[90]

36.     We reject this argument.  In the first place, the Truth in Caller ID Act does not require that there be actual harm; only that there be an intent to cause harm.  Further, the Truth in Caller ID Act is intended to prevent unlawful spoofing, which arises when the call is made using a spoofed number with the requisite intent; it is not dependent upon the called party answering the phone (let alone having a five-minute conversation with the caller).  In the second place, the record evidence refutes Abramovich's claim that only consumers that engaged in an extensive conversation were significantly harmed by the spoofed call.

37.     In the consumers' own words, the gravity of those repeated violations was significant.

- I JUST RECEIVED AN UNSOLICITED ROBOCALL TO MY PERSONAL PHONE NUMBER THAT IS ON A DO NOT CALL LIST.  THAT CALL STATED THAT IT WAS ON BEHALF OF TRIP ADVISORS` TRYING TO SELL ME SOMETHING.  IF I EVER GET A CALL LIKE THAT AGAIN, I WILL CONTACT THE FCC AND I WILL OPEN THE GATES OF HELL ON TRIP ADVISORS.  NEVER NEVER NEVER NEVER CALL ME LIKE THAT AGAIN. EVER. GOT IT.

- I have received repeated pre-recorded messages, some claiming to be from Marriott . . . they keep spoofing different numbers.

- I have daily—sometimes multiple times [a] day—inbound spoofed calls (same area code and prefix as my own phone number) purporting to be from [Marriott] . . . ."

- I'm on the do-not-call list, and I get telemarketing robo-calls to my cell phone every two hours.  It's unbelievably infuriating.  All of them have my same area code (617) and middle code (284) but the last 4 digits change every time.

---

[85] *Id*. at 3.

[86] Response at 4-5.

[87] *Id*. at 4.  The response refers to these calls (calls less than five minutes) as "short duration calls" and dismisses them on speculation that these calls may have been to out of service numbers, "facsimile machines, voice mail, or consumers that immediately hung up the phone."  *Id.*  Had Abramovich obtained the requisite consent required under the TCPA prior to robocalling these numbers, speculating as to the nature of these calls would not have been necessary.  *See Citation* at paras. 12-21.

[88] *See* Response at 4.

[89] *Id*. at 4.

[90] *Id*. at 5.

- I received an angry telephone call today from a man who says that my cell phone number has been calling him frequently with a Marriott prerecording about reservations.

- My phone number/caller ID is coming up on someone else's number. The gentleman called me to inform me that my number/caller ID shows up on his phone and when he answers it's Marriott Telemarketing.

- I am getting calls from people whom I don't know, telling me they are receiving calls from my number saying that someone keeps calling them trying to sell them services from Marriott Corporation. I am not calling them, and I have no ID [sic] who this corporation is. [91]

In addition, not only were consumers harmed by the violations, but the legitimate travel companies and hotels named in the pre-recorded messages played to consumers (e.g., TripAdvisor, Expedia, Marriott, Hilton) were also harmed, as was Spōk's medical paging network.[92]

38.     Thus, we reject the theory advanced in the Response that a consumer must listen to a spoofed robocall sales pitch or audio recording before he or she is harmed. Harm has been done whether or not the consumer listens to the robocall message afterward.

39.     Accordingly, the "extent and gravity" of the violations fully outweigh any downward adjustment that might arise from Abramovich's alleged inability to pay,[93] and, as explained below, the statutory factor of "justice" supports the full proposed forfeiture. Abramovich knowingly and intentionally spoofed the originating telephone numbers to encourage consumers to answer the phone, and he knowingly and intentionally misrepresented that the calls were coming from specific companies with which Abramovich had no affiliation or authority to represent. And he did so on a massive scale, making hundreds of thousands of spoofed calls a day during the time frame at issue. His actions were egregious, and demonstrate a blatant disregard for the law and for the expectations of trusting consumers. Pursuant to Section 1.80 of our Rules, such repeated, egregious, and intentional violations warrant an upward—not downward—adjustment to a forfeiture.[94]

## 2.     Abramovich is Highly Culpable with a History of Prior Offenses

40.     The statute also requires us to consider the culpability of the violator and any history of prior offenses.[95] In the *NAL*, we found that Abramovich was highly culpable with a history of prior offenses.[96] As we stated in the *NAL*, "[t]he call records show that the calls were made by Marketing Strategy Leaders—a company solely owned by, and sharing the residential address of, Adrian Abramovich."[97] The Response admits that Abramovich made the calls as part of a lead generator service on behalf of travel company clients.[98] Additionally, the *NAL* found that this was "not Abramovich's first experience with the Communications Act. In 2007, AT&T Mobility received a consent judgment and permanent injunction against Abramovich for unlawful telemarketing calls in violation of the TCPA."[99]

---

[91] *NAL*, 32 FCC Rcd at 5422-23, para. 13 & nn.32-35.

[92] *Id*. at 5420-21, para. 7 & n.17.

[93] *See infra* note 114.

[94] 47 CFR § 1.80(b)(8), Note to paragraph (b)(8).

[95] 47 U.S.C. § 503(b).

[96] *NAL*, 32 FCC Rcd at 5427, para. 26.

[97] *Id*.

[98] *See* Response at paras. 2, 3, & 6.

[99] *NAL*, 32 FCC Rcd at 5427, para. 26 (citing *AT&T Mobility v. Hispanic Solutions*, No. 1:06 cv 02695-WSD (N.D. Ga. Oct. 25, 2007)).

41.     Abramovich does not deny that he knowingly caused the display of inaccurate or misleading caller ID information to be transmitted.[100]  He claims, however, that the Commission misapplied the culpability and prior offense factors.  The Response argues that Abramovich's role in the telemarketing scheme was limited, and thus his degree of culpability for the violations warrants a downward adjustment.[101]  The Response states that Abramovich "played a specific role, namely conducting the lead generation activities."[102]  In that role, the Response admits that Abramovich made the calls at issue in the case.[103]  The Response states, however, that "[t]he complete telemarketing enterprise also involved the sales of the vacation packages by live operators under the direction of third-party travel companies" (i.e., Abramovich clients) and, further, "the carrier utilized by Mr. Abramovich" also played a role in the telemarketing scheme.[104]  Based on these "other" participants in the robocalling and spoofing scheme, the Response argues that the forfeiture should be reduced proportionately to reflect a proper "segregat[ion] [of] the actions of Mr. Abramovich from those of the other participants . . . ."[105]

42.     The Response fails to recognize the nature of the violations; in particular, that Abramovich—not the underlying carrier or the client travel companies with whom he worked—committed the acts constituting the spoofing violations at issue in this case.  The Truth in Caller ID Act outlaws "caus[ing] any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value."[106]  As discussed more fully above and in the *NAL*, the facts show that Abramovich was responsible for making the calls that form the basis for the forfeiture, and that he did so as part of a referral or "lead generator" service for his clients (third-party travel companies).  The call records show that the caller ID was spoofed (inaccurate or misleading).[107]  The evidence supports our finding that Abramovich intended to cause harm.[108]  Lastly, while asserting that the carrier and travel company clients should share some of the blame (and hence share in the forfeiture), the Response provides no evidence that Abramovich's carrier or any of his travel company clients (who remain unnamed anywhere in the Response) knowingly caused inaccurate or misleading caller ID to be transmitted with the required intent to defraud, cause harm, or obtain anything of value.  Thus, we need not reach a decision on whether Abramovich's carrier or clients are jointly and severally liable together with Abramovich and reject the Response's argument that a downward adjustment is warranted based on its theory of shared or apportioned liability.

---

[100] *See* Response at 1; *NAL*, 32 FCC Rcd at 5422-23, paras. 12-14 (finding that Abramovich apparently knowingly displayed inaccurate or misleading caller ID information).

[101] *See* Response at 5.

[102] *Id.*

[103] *Id.* ("The FCC's allegations clearly establish that Mr. Abramovich's participation was limited to the making of the offending phone calls.").

[104] *Id.*  With respect to the carrier, the Response speculates that the carrier "must have had knowledge of the improper caller ID information provided to the consumers receiving calls, and facilitated the operation by allowing the calls to continue."  *Id.*

[105] *Id.*

[106] 47 U.S.C. § 227(e)(1).

[107] As discussed in the *NAL*, the call records "contained the called number, caller ID number, time stamp, call duration, and the IP address that sent the calls to the carrier."  *NAL*, 32 FCC Rcd at 5422, para. 12.  Based on analysis of a representative sample (unchallenged by Abramovich), the call records show "the first six digits of each caller ID number matched the first six out of ten digits of the called consumer—a practice often referred to as 'neighbor spoofing.'  *See id.*  "Neighbor spoofing" involves altering the caller ID information to mimic the first six digits—the area code and central office code—of the called number.

[108] *See supra* paras. 13-15; *see also NAL*, 32 FCC Rcd at 5422-25, paras. 12-21.

43.     With respect to prior offenses, the Response asserts that "the civil case cited in footnote 60 of the *NAL* did not involve the Commission, did not involve the spoofing activities present in this case, and occurred over a decade ago,"[109] and thus should not be considered prior misconduct.  We reject this argument.  Section 1.80 of the Rules implements the Section 503 adjustment criteria, including adjustments for prior violations.  In accordance with Section 1.80, an upward adjustment is warranted for "[p]rior violations of *any* FCC requirements."[110]  Moreover, the prior violation involved the TCPA (the same type of violations found in the *Citation*) which makes it relevant to this case.  Further, the upward adjustment contemplated by Section 1.80 and Section 503 regarding prior violations requires us to consider "*any* history of prior offenses" regardless of the Commission's involvement or when the violation took place.[111]

### 3.     Ability to Pay is Only One Factor in the Commission's Forfeiture Analysis

44.     When we assess forfeitures for violations of Section 227(e), the Commission has stated that it will "employ the balancing factors" of Section 503 "when determining the amount of a forfeiture penalty" to take into account the specific facts of a given case.[112]  The Commission applied those balancing factors in this case.  Abramovich's primary argument is an asserted inability to pay (i.e., the only argument supported by the Affidavit of Adrian Abramovich).[113]  The response included personal and corporate tax returns for the past three years.[114]  Although the Commission has looked at the prior three years of tax returns as one way to benchmark an ability to pay, we also recognize that income may represent only a small fraction of a wrongdoer's wealth.  Thus, the tax returns in themselves may not fully address whether the wrongdoer is able to pay the proposed forfeiture.[115]  We note, too, that when the Department of Justice pursues collections on the Commission's behalf, it looks at a wide range of

---

[109] Response at 5.

[110] 47 CFR § 1.80(b)(8), Note to paragraph (b)(8) (emphasis added).  *See* 47 U.S.C. § 503(2)(E).

[111] 47 U.S.C. § 503(2)(E) (emphasis added); 47 CFR § 1.80(b)(8), Note to paragraph (b)(8).

[112] Although the Commission is not statutorily required to apply the section 503(b)(2)(E) balancing factors in cases involving apparent violations of section 227(e), the Commission said it would do so.  *See Truth in Caller ID Act Report and Order*, 26 FCC Rcd at 9132, para. 46 ("In order to provide guidance about the factors the Commission will use in determining the amount of penalty it will assess for violations of the Truth in Caller ID Act, we adopt . . . the balancing factors the Commission typically considers when determining the amount of a forfeiture penalty. . . . The balancing factors include the nature, circumstances, extent, and gravity of the violation, and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require.  These factors allow the Commission to properly consider the specific facts of each case when determining an appropriate forfeiture penalty." (citations omitted)).

[113] *See* Response at 5-6.  In support of the inability to pay argument, the Response included corporate and personal tax returns of Mr. Abramovich and his companies.  *See* Affidavit of Adrian Abramovich, Exhibit A.

[114] Abramovich's personal and corporate tax returns show that on average over the last three years, he and his companies made just under ███████ per year.  *See* Affidavit of Adrian Abramovich, Exhibit A.

[115] In addition, Mr. Abramovich offers no basis for the Commission to conclude that his estimated "present" income (for the year 2016) is representative of his future earning potential.  Further, Mr. Abramovich presents no evidence concerning his educational background, physical capacity, or professional skills that might enable the Commission to assess his future earning potential.  Finally, Mr. Abramovich made no showing regarding assets he or his companies may have to satisfy the forfeiture, including available funds, potential access to capital, and whether he or his companies may come into funds in the future.  *See, e.g.*, *United States v. Elizabeth Mastropierro, et. al.*, 931 F.2d 905, 906-07 (D.C. Cir. 1991) (When considering ability to pay in applying the sentencing guidelines, the court recognized "the appellants are currently without substantial assets or gainful employment and therefore unable to pay the full fines immediately, we nevertheless conclude that the record supports the judge's implicit finding that they can obtain employment and pay the fines over time.")

resources, beyond tax returns, in evaluating a person or entity's ability to pay a claim or judgment.[116]  If we limit our analysis to tax returns, the Commission would be ignoring relevant assets that the Department of Justice would consider in its ability to pay determination, potentially reducing the pool of assets that could factor into the determination.[117]

45.     However, even if we assume for the sake of argument that Abramovich lacks other financial assets beyond those identified in his tax returns, we decline to reduce the forfeiture based on asserted inability to pay.  As discussed above, Abramovich's operations relied on deceptive telemarketing to generate leads for his clients; he was not otherwise using honest marketing practices.  Thus, in this case, we do not need to consider whether the forfeiture would potentially harm the public by putting a legitimate company offering a desired service out of business.  That is not the case here.  In any case, ability to pay is only one of several factors we consider in determining the appropriate forfeiture and, as explained below, we find that factor to be greatly outweighed by the other balancing factors that militate in favor of a large forfeiture.[118]

4.     **Justice Requires the Commission to Account for Other Factors When Assessing This Forfeiture**

46.     Section 503 requires that we take into account "other matters as justice may require."[119]  We recognize that a $120 million forfeiture is a very large forfeiture, indeed the largest that the Commission has issued, and we do not issue this decision lightly.  But the forfeiture is warranted by the facts of this case.  Abramovich was responsible for the most extensive caller ID spoofing schemes we have ever encountered, and he caused companies and individuals extensive harm.  His request for a downward adjustment because the forfeiture resulting from his massive illegal activities is too high is effectively a request that we discount the scope of his wrongful activity.  We find no basis for doing so.  In cases like this, where a person engages in rampant lawlessness in violation of the Act and our Rules, our forfeiture must be high enough to deter future wrongdoing, and ensure that our forfeiture is not just the cost of doing business.

47.     Further, in a separate action released simultaneously with the *NAL*, the Bureau cited Abramovich for making illegal telemarketing robocalls to consumers on their wireless and landline phones, as well as to critical emergency phone lines, without prior express written consent and absent an

---

[116] *See* U.S. Department of Justice, Financial Statement of Debtor, https://www.justice.gov/sites/default/files/usao-wdwa/legacy/2011/10/03/Fillable%20Form%20Financial%20statement%20individual.pdf.  These include, for example, bank accounts, investments, cash, available credit, participation in profit sharing plans, vehicles, any anticipated increase in household income in the next two years, real estate, personal assets, and accounts or loans receivable.  The FCC also considers assets, liabilities, income, and expenses when determining the ability to pay a debt in installments.  *See* 47 CFR § 1.1914.

[117] It makes little sense for the Commission to limit its consideration to a subset of potential resources.  Because the Department of Justice may not collect more than the forfeiture amount that the Commission establishes, limiting our ability to pay analysis effectively reduces the broader scope of resources that the Department of Justice will include in its analysis.

[118] In no case where we have adjusted downward a proposed forfeiture for inability to pay has there been such an overwhelming number of violations committed by a single individual or the number (in the millions) of consumers that were harmed.  Thus, we are not guided by those prior cases.  In fact, even in cases involving far fewer violations and consumer harm, where the violations are repeated or particularly egregious, as in this case, our precedent is to not adjust the forfeiture downward for inability to pay.  *See Purple Communications, Inc*., Forfeiture Order, 30 FCC Rcd 14892, 14903-904, paras 32-33 (2015) (acknowledging that "standing alone, Purple's financial documents might support a reduction" but finding after applying the balancing factors no reduction was warranted); *Telecom Long Distance, Inc*., Forfeiture Order, 31 FCC Rcd 10392, 10410-411, paras. 42-44 (2016); *see also infra* note 121.  Thus, our conclusion not to downward adjust in this case follows these latter line cases and is based on the facts before us and guided by the balancing factors of Section 503(b)(2)(E).

[119] 47 U.S.C. § 503(2)(E).  *See* 47 CFR § 1.80(b)(8), Note to paragraph (b)(8).

**Federal Communications Commission**                    **FCC 18-58**

emergency purpose.[120]  The Bureau also found that Abramovich committed fraud in violation of federal wire fraud laws.  In considering the appropriate forfeiture for the spoofing violations, we believe that it is appropriate to consider the context in which those spoofing violations occurred—in furtherance of a massive robocalling campaign to millions of consumers without their prior written consent.  Justice requires that we consider the egregiousness of Abramovich's violations, the consumers he harmed, and the scale and scope of his illegal activities.  Justice also requires that we consider that Abramovich lived at the expense of the consumers and businesses that he harmed.  The facts in this case do not warrant a reduction in the proposed forfeiture.

48.      Accordingly, after balancing the statutory factors and taking into consideration the arguments advanced in the Response, we find that the statutory factors were appropriately applied in this case and no downward adjustment is warranted.  Our decision not to downward adjust based on ability to pay is consistent with prior precedent.[121]  As we said in the *NAL* when proposing the forfeiture, "When adopting its spoofing rules, the Commission said that it would 'seek substantial penalties' against violators.  Because of the ease and low costs that technology has brought to the task of generating telephone calls and falsifying caller ID information for unlawful purposes, large-scale violators may generate hundreds of thousands or even millions of illegal calls within a short period of time.  We find that large-scale spoofing operations tend to be more harmful to consumers. . . .  Accordingly, any proposed forfeitures in such cases must reflect the exponential harm associated with large-scale spoofing."[122]  Thus, we decline to downwardly adjust the proposed forfeiture notwithstanding Mr. Abramovich's request to reduce the forfeiture amount based on an inability to pay.  Rather, we find that factor to be greatly outweighed by the other balancing factors that militate in favor of a large forfeiture.  We, therefore, conclude, based upon the evidence before us, that the proposed forfeiture of $120,000,000 properly reflects the seriousness, duration, and scope of Abramovich's violations.

## IV.      CONCLUSION

49.      Based on the record before us and the applicable statutory factors, we conclude that Abramovich willfully and repeatedly violated Section 227(e) of the Act[123] and Section 64.1604 of the Rules.[124]  We decline to cancel or reduce the $120,000,000 forfeiture proposed in the *NAL*.

## V.      ORDERING CLAUSES

50.      Accordingly, **IT IS ORDERED** that, pursuant to Sections 227(e)(5)(A)(i) and 503(b) of the Act[125] and Sections 1.80 of the Rules,[126] Adrian Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc., are **JOINTLY AND SEVERALLY LIABLE FOR A MONETARY FORFEITURE** in the amount of one hundred twenty million dollars ($120,000,000) for willfully and repeatedly violating Section 227(e) of the Act[127] and Section 64.1604 of the Rules.[128]

---

[120] *See supra* note 3.

[121] *See, e.g., TV Max, Inc., et al.*, Forfeiture Order, 29 FCC Rcd 8648, 8661, para. 25 (2014) (noting that the Commission "has previously rejected inability to pay claims in cases of repeated or otherwise egregious violations"); *Kevin W. Bondy*, Forfeiture Order, 26 FCC Rcd 7840, 7844-45, para. 16 (EB 2011) (violator's repeated intentional and malicious violations outweighed evidence of inability to pay), *recon. dismissed*, Memorandum Opinion and Order, 28 FCC Rcd 1170 (EB 2013); *Whisler Fleurinor*, Forfeiture Order, 28 FCC Rcd 1087, 1090, para. 9 (EB 2013) (violator's demonstrated inability to pay outweighed by gravity of repeated violations).

[122] *NAL*, 32 FCC Rcd at 5426, para. 24.

[123] 47 U.S.C. § 227(e).

[124] 47 CFR § 64.1604.

[125] 47 U.S.C. §§ 227(e)(5)(A)(i), 503(b).

[126] 47 CFR § 1.80.

[127] 47 U.S.C. § 227(e).

18

51.        Payment of the forfeiture shall be made in the manner provided for in Section 1.80 of the Rules within thirty (30) calendar days after the release of this Forfeiture Order.[129]  If the forfeiture is not paid within the period specified, the case may be referred to the U.S. Department of Justice for enforcement of the forfeiture pursuant to Section 504(a) of the Act.[130]

52.        Payment of the forfeiture must be made by check or similar instrument, wire transfer, or credit card, and must include the NAL/Account Number and FRN referenced above.  Adrian Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc., shall send electronic notification of payment to Lisa Williford at Lisa.Williford@fcc.gov on the date said payment is made.  Regardless of the form of payment, a completed FCC Form 159 (Remittance Advice) must be submitted.[131]  When completing the Form 159, enter the Account Number in block number 23A (call sign/other ID) and enter the letters "FORF" in block number 24A (payment type code).  Below are additional instructions that should be followed based on the form of payment selected:

- Payment by check or money order must be made payable to the order of the Federal Communications Commission.  Such payments (along with completed Form 159) must be mailed to the Federal Communications Commission, P.O. Box 979088, St. Louis, MO 63197-9000, or sent via overnight mail to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, 1005 Convention Plaza, St. Louis, MO 63101.

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001.  To complete the wire transfer and ensure appropriate crediting of the wired funds, a completed Form 159 must be faxed to U.S. Bank at (314) 418-4232 on the same business day the wire transfer is initiated.

- Payment by credit card must be made by providing the required credit card information on FCC Form 159 and signing and dating the Form 159 to authorize the credit card payment.  The completed Form 159 must then be mailed to Federal Communications Commission, P.O. Box 979088, St. Louis, MO 63197-9000, or sent via overnight mail to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, 1005 Convention Plaza, St. Louis, MO 63101.

53.        Any request for making full payment over time under an installment plan should be sent to:  Chief Financial Officer – Financial Operations, Federal Communications Commission, 445 12th Street, SW, Room 1-A625, Washington, DC 20554.[132]  Questions regarding payment procedures should be directed to the Financial Operations Group Help Desk by telephone, 1-877-480-3201, or by e-mail, ARINQUIRIES@fcc.gov.

---

(Continued from previous page)

[128] 47 CFR § 64.1604.

[129] 47 CFR § 1.80.

[130] 47 U.S.C. § 504(a).

[131] An FCC Form 159 and detailed instructions for completing the form may be obtained at http://www.fcc.gov/Forms/Form159/159.pdf.

[132] *See* 47 CFR § 1.1914.

**Federal Communications Commission**                    **FCC 18-58**

54.      **IT IS FURTHER ORDERED** that a copy of this Forfeiture Order shall be sent by first class mail and certified mail, return receipt requested, to Adrian Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc., at ███████████████████████████, and to Rodolfo Nuñez, P.A., Esq., Law Office of Rodolfo Nuñez, 2100 Salzedo Street, Suite 303, Coral Gables, FL 33134.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**STATEMENT OF**
**CHAIRMAN AJIT PAI**

Re:     *Adrian Abramovich, Marketing Leaders, Inc. and Marketing Leaders Inc., File No. EB-TCD-15-00020488, Forfeiture Order*

After the FCC proposed fining Adrian Abramovich $120 million last year for allegedly engaging in a massive spoofed robocall scheme, we gave him the chance to contest the allegations.  Mr. Abramovich did in fact respond to our Notice of Apparent Liability.  That response is more notable for what it doesn't say than what it does.

Specifically, Mr. Abramovich doesn't dispute that he was responsible for placing 96,758,223 robocalls during a three-month period in 2016.

He doesn't dispute that all these robocalls were made without the recipient's consent.

And he doesn't dispute that all these robocalls were accompanied by inaccurate caller ID information, making it appear as though they were coming from the same community as the party being called, a practice known as "neighbor spoofing."

What Mr. Abramovich does have to say in his defense isn't very convincing.  For example, he asserts that he had "no intent . . . to defraud, cause harm or wrongfully obtain anything of value."  But if so, why did he include fraudulent caller ID information with each and every one of his 96 million robocalls?  Friendly visitors don't wear disguises to mask who they are.  And why did the recorded messages indicate that the calls came from well-known travel or hospitality companies such as Marriott, Expedia, Hilton, and TripAdvisor, even though they were attempting to sell vacation packages at destinations unrelated to those named companies?

Moreover, Mr. Abramovich didn't just have the intent to defraud or cause harm.  He actually caused harm.  Just ask his victims—a number of whom are elderly—who were duped into purchasing travel deals under false pretenses.  Or ask Spōk, a Virginia-based medical paging service whose emergency communications services were disrupted by a flood of robocalls attributed to Mr. Abramovich's companies.

Mr. Abramovich also claims that the consumers who received these robocalls were only harmed if the calls lasted for at least five minutes.  So he says he should only be penalized for calls that long or longer.  With all due respect, this is a ridiculous argument.  I haven't met a single American who likes getting these kinds of robocalls, regardless of length.  And in any case, our rules against caller-ID spoofing certainly don't permit spoofed robocalls so long as they string you along for 4:59 or less.

Tough enforcement is a key part of the FCC's robust strategy for combatting illegal robocalls, and this Forfeiture Order represents a big step forward in our enforcement efforts.  This is the largest illegal robocalling scheme that the FCC has investigated to date, and we are appropriately imposing a $120 million forfeiture in response.  This is the largest forfeiture in the history of the FCC.  Our decision sends a loud and clear message: this FCC is an active cop on the beat and will throw the book at anyone who violates our spoofing and robocall rules and harms consumers.

We would not have arrived at this result without the hard work of the Enforcement Bureau's dedicated staff.  They spent countless hours combing through the evidence and pulling investigatory threads together.  I want to thank Vilma Anderson, Tamara Baxter, Jonathan Garvin, Lisa Gelb, Rosemary Harold, Richard Hindman, Lisa Landers, Latashia Middleton, Nakasha Ramsey, Stacy Ruffin Smith, Michael Scurato, Daniel Stepanicich, Kristi Thompson, Kimbarly Taylor, Kim Thorne, Melanie Tiano, Bridgette Washington, and Lisa Williford.  You will continue to have our support as you seek to bring to justice the scofflaws and scammers who for too long have been bombarding Americans with unlawful robocalls.

**STATEMENT OF
COMMISSIONER MICHAEL O'RIELLY
APPROVING IN PART, DISSENTING IN PART**

Re:     *Adrian Abramovich, Marketing Leaders, Inc. and Marketing Leaders Inc., File No. EB-TCD-15-00020488, Forfeiture Order*

From a starting point, it should be noted that Mr. Abramovich does not contest that he was responsible for making the millions of calls that are the subject of this Forfeiture Order.  What I believe is the central matter for debate is whether he "intended to defraud, cause harm, or wrongfully obtain anything of value" when he made the calls, as is the precise language of the statutory prohibition.

I fully agree that the facts support the conclusion that he intended to defraud consumers.  The item and underlying Notice of Apparent Liability describe how Mr. Abramovich and his clients lied to consumers, falsely claiming to represent companies such as TripAdvisor, Marriott, and Expedia, in order to connect unwitting consumers to unaffiliated travel agents who worked with foreign call centers to sell timeshares and vacation packages.  That's pure fraud and there is plenty of data to meet the intent to defraud standard.

Where I part ways is the claim that he also intended to cause harm to various individuals or businesses.  From what I can tell, his intent was to make a buck.  More succinctly, he wanted to make as many bucks as possible.  I don't see in the item or have any evidence that he spent time thinking about what might happen to consumers or companies so long as enough calls went through to make his fraudulent venture profitable.  I'm even more skeptical that he intended to harm consumers whose numbers were spoofed.  He used local numbers to increase answer rates, not to damage the reputation of people associated with those numbers or the underlying businesses subject to fraud.  And, I do not subscribe to the notion that "[h]arm has been done whether or not the consumer listens to the robocall message."  This whole theory is off the mark and completely unnecessary for our purposes, as the Commission can and should proceed on the intent to defraud basis alone to impose the full monetary penalty on Mr. Abramovich.

In short, I believe the Commission should impose the penalty on Mr. Abramovich, but we do not need to rely on a circumstantial intent to harm theory to get to that result.  I approve in part and dissent in part.

## STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re:     *Adrian Abramovich, Marketing Leaders, Inc. and Marketing Leaders Inc., File No. EB-TCD-15-00020488, Forfeiture Order*

When I was in high school, I remember our family getting an external caller ID device.  It was a white box, about the size of a deck of cards, that you plugged into your landline phone.  It was an exciting time in the Carr household to be sure.

The ability to see who was calling before picking up the phone was an innovative idea back then.  But Caller ID is now something we've come to rely on to help us decide whether to trust the caller on the other end of the line.

Congress recognized this and the value of accurate, reliable caller ID information when it passed the Truth in Caller ID Act.  That law focuses on the harms to consumers and businesses alike when bad actors spoof or mask their identities as part of a scheme to defraud or cause harm.

We have one of the worst such examples before us today.  The record shows that over just one three-month period, Abramovich or his company placed over 90 million illegally spoofed robocalls.  Through a practice known as "neighbor spoofing"—which involves displaying the first six digits of his targets' phone numbers—Abramovich apparently found a way to increase the likelihood that consumers would pick up the phone.  Once on the line, they'd be told they were speaking with a reputable company, but then the bait and switch would come.  Call center workers would try to sell them time shares or vacation packages from groups unrelated to the brand name company.  This not only defrauded consumers but harmed the reputation of those legitimate businesses.  In this case, his scheme also endangered public safety by overwhelming an emergency paging service that was not equipped to handle large volumes of voice calls.

So I am glad that the Commission is continuing to treat illegal robocalls as our top enforcement priority and that, by imposing this $120,000,000 penalty, we are taking appropriately strong action in this case.

Thank you to the staff of the Enforcement Bureau for your diligent work on this important investigation.  The Order has my support.

## STATEMENT OF
## COMMISSIONER JESSICA ROSENWORCEL

Re:     *Adrian Abramovich, Marketing Leaders, Inc. and Marketing Leaders Inc., File No. EB-TCD-15-*
        *00020488, Forfeiture Order*

If you think the number of robocalls you receive is going up, you're right.  We're drowning in them.  Last month there were 3.4 billion robocalls nationwide.  That's one third more robocalls than during the same month last year.  This is insane.

Today the FCC adopts a forfeiture order imposing a penalty on one operation that made tens of millions of robocalls two years ago.  I support it.  But let's be honest: Going after a single bad actor is like emptying the ocean with a teaspoon—and right now we're all wet.

So what should we be doing?

First, two months ago, the courts overturned FCC rules adopted in 2015 that were designed to prevent robocalls.  We need to respond—stat.  That means revisiting the definition of autodialers and identifying just how they can be used to call millions of consumers.  It could also mean revisiting just how consumers can revoke consent they may have given previously to companies to make calls.

Second, we need to get our house in order.  There are 20 outstanding petitions before the FCC that were filed in the wake of the 2015 rules.  They ask for everything from exemptions for mortgage lenders, insurance companies, and student loan servicing.  They seek technical limitations for voicemail and text messaging.  Some want retroactive waivers in order to presume consumer consent for whole classes of robocalls.  These petitions are gathering regulatory dust.  They deserve a response.

Third, pursuant to the Bipartisan Budget Act of 2015, the FCC adopted rules to place reasonable limits on robocalls when it comes to government debt.  But these rules have mysteriously disappeared.  Check the Code of Federal Regulations, they are nowhere to be found.  These missing policies belong on the books.

Fourth, it has been almost two years since the Robocall Strike Force identified SHAKEN/STIR as a call authentication technology that can reduce robocalls.  In the intervening time, Canada went ahead and set a 2019 deadline to put this technology in place.  We should be doing the same.  Our robocall resistance deserves to be every bit as strong as our neighbors to the north.

I look forward to working with my colleagues to make this happen and I appreciate that the Chairman has stated that this is a top priority for the FCC.  More importantly, I look forward to doing more than taking a single enforcement action to stop this rising tide of nuisance calls—and when we do so I want us to use every tool we've got.